Our fourth case this morning is National Foundation For Special Needs Integrity v. Devon Reese v. Reese Yes, Mr. Beckemeyer, you may proceed whenever you're ready. I'm James Beckemeyer, I'm here on behalf of the Givens family. We have the privilege to represent a family trying to recover remainder trust funds from a special needs trust that Ms. Givens set up with the National Foundation For Special Needs Integrity. The form special needs trust in question was created by NFSNI's founder, Shane Service. Mr. Service testified, and it's also within the testimony under summer judgment, that the trust was intentionally created to be confusing. The trust was, he made it confusing to try to confuse Medicaid employees in order to try to retain money for, he claimed, the beneficiaries as well as for NFSNI, if possible. He however said that even though he intentionally drafted this trust to be confusing, that Ms. Givens, a basically illiterate, 8th grade educated woman who was in incredibly poor health and or her son or somebody else who looked at it, they would have understood it. Which obviously doesn't make any sense, and amazingly the district court adopted that as a finding. In what is a clear and obvious mistake, Teresa Givens put herself down as the contingent remainder beneficiary on this trust. Obviously a grantor of a trust, which she was, cannot be the contingent remainder beneficiary. That's impossible. Well, right, and there could have been no confusion about that. Whatever confusion there was vis-a-vis when Medicaid gets paid doesn't translate to confusion about naming yourself as a beneficiary after death. I don't disagree that those two things are not correlated. My point is that if the trust is intended to be confusing in some sense, obviously it's ambiguous, and the court found there was no ambiguity, which I'll get into in more detail on both the issue of the trust being confusing at large, which the drafter said it was intended to be confusing, and then secondly, the court found it wasn't an ambiguity that Ms. Givens put herself down as the contingent remainder beneficiary, which is impossible. So how could there not be an ambiguity? Would it have been sufficient if she had written, I mean this doesn't look like her handwriting by the way, but estate of Teresa Givens, would that have been sufficient? The form itself did not allow you to do that, and it was, the form if you read it, which it's in the legal file obviously. An entity, the estate, why not say just estate of Teresa Givens? If I recall from the form, it wants you to put a person down. Or an entity. Well I'm not sure if you're looking at the right part, but I, or an entity, yeah I guess an estate. So not my heirs at law, or my issue. The point being is, she is not a sophisticated individual who would have thought to write down her estate. Sure. So let me ask you about another aspect of the agreement that I think you focused on in the district court. Yes. I'm looking at, this is Article 4 of the document, and the second paragraph says, except in the event this Article 14 may be in the future amended to effectuate the letter, spirit and purpose of the statutory provision, quote, the National Foundation for Special Needs Integrity Inc. shall not retain any portion of the beneficiary's trust sub-account upon his or her death. Correct. Now, if I look at that sentence by itself, it certainly seems to work in your favor. Correct. I look down a little further, and I see, if no secondary contingent residual remainder beneficiaries survive, or if none are named in Section 5 below, then and only then shall said money remain with the trust. If I look at that by itself, I think I understand it. I have a lot of trouble making sense of those two sentences together. Correct. Which suggests to me this might well be an ambiguous document. I believe they're internally contradictory. Did the district judge offer an explanation for resolving the tension there? No, she just deemed it was no ambiguity at all, which I believe is an error. She erred in a number of ways as to the ambiguity. The first point in our briefing is on the rescission argument. We believe a trust was never legally formed. In order for a contract, a trust, to be legally formed, as we all know, there has to be a meeting of the minds. The material terms have to be agreed upon. A material term in a trust, or any type of document of that nature, is the dispositive provision, who gets it when I die? She put herself down. That's impossible. That is an ambiguity, and we believe that because of that clear ambiguity, that clear mistake, that rescission is the appropriate remedy. Therefore, the trust should have been rescinded, and in that she died in test state, then the funds would have gone to her estate. The case law we cite to support that, Chicago Litho Plate Graining Co. versus Allstate, which is a Seventh Circuit case, allows for a unilateral mistake, and basically determining when there is a mistake that creates an absurdity, that rescission is appropriate. We also cite to Carlson versus Sweeney, which sets out the mutual mistake context, and the evidence in the record demonstrates this was clearly a mutual, not only was it unilateral, obviously, but it was definitely a mutual mistake as well, in that NFS&I's representatives testified that they missed it. You know, their normal process would have been to have looked at this when it came in before they signed off, and somehow they missed it, and had they found it, they would have required her to fix it. So it's clearly a mutual mistake, as well as, obviously, a unilateral mistake. Therefore, yes. Well, Carlson, the Indiana case, explains that mutual mistake in the context of trust is not really a good theoretical fit, because there isn't mutual intent, there isn't mutual consideration, it's the settler has an intent, and that's what counts, and if the settler makes a mistake, then that unilateral mistake is grounds for rescission or reformation. Our point to that is, you get it both ways. So, you know, the general data... Right, but there's no need to show mutual mistake. I completely agree with you. You don't even need to show mutual mistake. We just argued it from a standpoint of there is both, if it's necessary. But I agree, to your point, she's the grantor, she messed up, unilateral mistake, we have no trust. That's just the real simple legal argument. Secondly, on error, which we've already addressed, the trust is clearly ambiguous. The trial court erred in determining it was not. In University of South Indiana Foundation v. Baker, the court sets forth, quote, basically to define what an ambiguity is, it says, if reasonable people could come to different conclusions as to its meaning. She put herself down as the contingent remander beneficiary, that's impossible. So clearly that's an ambiguity. Reasonable people could sit there and say, what did she mean? What did she want? That there's an ambiguity. Hayworth v. Hubbard goes on in a different case to basically say that if a word creates an absurdity, an impossibility, then the court has the right to disregard it and to therefore move beyond that word, even though the word itself might be clear. And their argument is, hey, she put herself down. We all know it's her. Well, yeah, but she can't be the contingent beneficiary, therefore it's an absurdity and the court should disregard that. Finally, there's numerous cases. We cite a few, Berry v. Ford, the matter of estate v. Waters, that talk about the presumption that is clear under Niena law, that if there's an ambiguity or unclarity as to dispositive provisions of an estate document, that the presumption is they wanted it to go to their heirs. And the court completely disregarded that. And there is no evidence in the record, none, that she wanted it to go to anyone else other than her heirs. The only contradictory evidence is a claim by Ms. McGowey, the paralegal who had an interest to falsely state things, that she got a phone call when Ms. Gibbons changed her mind about the amount of money to put into the trust and that she was fighting with her kids about the money, about what to use it on during her life. There's nothing in the record as to what would happen when she died, that she changed her mind about giving it to her kids. And in fact, the record is crystal clear, she always, when asked on what she wanted to happen with the money, up until her deathbed, said, I want it to go to my kids. That was a statement that addressed, at least potentially, a dispute between her and her children about what to do with the settlement proceeds, whether they should all go to see to her own care, or whether some of those proceeds should be given to the children. It has nothing to do with what should happen after she dies. Exactly. The fight was about what happens now I'm alive, allegedly. We don't agree with that happening, but whatever, the court ruled that it did. Therefore, we have to adopt that unless we can be proven that she abused her discretion in that regard, which I think we can, which is our fourth point of appeal. I'll come back to the third, which is brief, but reformation at trial. The clear and convincing evidence standard is obviously a high standard, it's a high bar to overcome at trial. The issue here is we believe the judge did, in fact, breach the standard, or we met the standard and she acted in a clearly erroneous manner. In that, what I just said, the evidence, the only contradictory evidence, the only contradictory evidence was Andy McGowey's testimony. And that, to your point, Judge, you hit it on the head, it has nothing to do with what happens when Teresa Givens dies. It only had to do with the dispute about why put $180,000 into the trust versus all $250,000, you know, using round numbers. And she wound up putting all of it in because her lawyers at the time were telling her, you have to do that, you're going to lose your special needs, you're going to lose your government benefits. So therefore, she did. So the issue there is not what happens when Teresa dies. When she dies, it was clear she wanted it to go to her kids. That's what she told Ms. McGowey years before. That's what she told Shane Service months before. That's what she told her son on her deathbed. There's no evidence to contradict that. Therefore, we believe the judge clearly erred in finding we did not meet our burden of clear and convincing. What about the Latches? Oh, excuse me. Go ahead, please. The Latches argument? On Latches, first of all, we think it's an advisory opinion in the sense that we lost on all the other ones. With that being said, if the court were to uphold the district court, which we don't believe you should, but if you did, the Latches opinion is moot. So that's just an administrative matter. As it relates to the substance. You have to win on Latches. Pardon? I thought you had to win on Latches here. We had to win on Latches? Yeah. My argument would be. If we agree with you on the merits, you could still be losing on Latches. What I'm saying is, if we lose on all the other four points of appeal, the Latches point is moot. However, on to the substance. Tell us why you should win on Latches. I'll tell you. There's three elements of a Latches claim under Indiana law. They didn't meet any of them. The first element is that there has to be inexcusable delay to assert a known right. The district court found that Whitney, Ms. Given's daughter, was told by NFS and I that they were keeping the money. That is false. There is nothing in the record that she was told that. Nothing. In fact, we tried to admit evidence related to that, NFS and I objected, and she sustained their objections. But Whitney wasn't there to testify. She was not there to testify. So those hearsay objections look pretty sound. I'm not questioning the judge's ruling on those objections. She was correct in doing that. Let me just hypothesize something. I'll be interested to hear what the foundation has to say. But it looks to me like the district judge may have confused telling the family, you're not going to get this money now, it may have to be held for Medicaid, with it's never going to you. I don't know what she did, but she ruled that Whitney was told they weren't going to get it, period. And they were keeping it. And that's not true. There was no evidence as to that. And the bottom line is, Mr. Reese, who did testify, he's the personal representative of her son, he testified it was his understanding that the money was going to Medicaid, which was not in fact true. So bottom line is, they didn't meet element one. They didn't meet the known right. Am I out of time? His testimony was that's what he knew three months after her death? Say that one more time. He testified that he was aware that they were not going to get the money within three months after her death. Right. And then if you look at his testimony prior to that, the context of it was he thought it was going to Medicaid. So therefore, they basically were told it's all going to get chewed up by Medicaid, so there's nothing to fight about, which in fact that's not true. Medicaid had a zero lien. But everybody understood that Medicaid was first in line if it had a legitimate claim. Right. So the point is, in order to have a known right, they needed to be notified that the money was there, it wasn't going to Medicaid, and NFS&I was keeping it. They were never notified of that. There's no evidence of that. So they lose right there. Could I ask you, was there any, no, go ahead, go ahead on latches and I'll save the question for later. The second point is easy, waiver. Well, you can't waive something you don't know about. Thirdly, this idea that there's a change in circumstance that would prejudice NFS&I, again, we don't believe they met that burden for this reason. NFS&I spent, and the evidence is clear, much of Miss Gibbons' money on completely illicit and inappropriate things such as lavish hotels, lavish restaurants, you know, just boondoggles. And the court apparently disregarded that, but also the idea that NFS&I would have to grab this money from their general pool and that would somehow be unfair or prejudicial in the sense that it's a different class of beneficiaries, that's a fallacy. That's how special needs trusts work. So they're basically saying it was perfectly fair to keep all of Theresa Gibbons' money over here. Her money was in the trust for about six weeks before she died and she was assessed something like $7,000 in fees for other litigation, right? She had about $7,000 in fees and then about $13,000 in benefits and the rest was left in the trust. Could I ask you very quickly, was there any evidence in the trial record about Miss Gibbons' life expectancy at the time she entered into the joiner agreement? There is none. Okay. And could you tell us about the status of the legal malpractice claim? Yes, that action is pending currently. It's at the motion dismiss phase. Missouri State Courts? In Missouri State Courts. And would it be correct that even if you won here, the estate or the heirs would have still some claims in essence for the cost of having to correct mistakes through this litigation? The estate had a duty under Missouri law to pursue NFS&I in addition to the attorneys who committed malpractice. They will do that regardless of the outcome in this case, but we believe that NFS&I should refund this money first and then, yes, the estate would continue to go after the law firm for malpractice. Counsel, Indiana has a modification doctrine. Yes. And I noticed that that's not argued in the brief and apparently not below. Why not? The modification doctrine, which is set for – it is in the brief, I believe. It was Code 30-4-326. Is that what you're talking about, sir? That's our fourth point on appeal. I can briefly state on that if I'm – Please. Please. Go ahead. The court found that Code 30, the modification statute, didn't apply. And the reasoning the court gave was it said, quote, there's no evidence that Teresa Givens listing herself as the only remainder beneficiary was unforeseen or not anticipated. That's what the court found. However, in race, El Chapman, which is a trust case – You're talking about deviation or modification. Well, the modification deviation statute is the same regime. It's just, one, there's different remedies depending upon what you're – as I recall, on what you're doing. We argued that the deviation was appropriate and the trial court – You did argue deviation. You didn't argue modification. It seemed to me, looking at the statute, that modification was more appropriate. I believe – I honestly can't recall the exact distinction between those two. What we did argue was deviation, and we believe it was appropriate and that the trial court erred based on the finding of the Chapman case, which basically includes in the list of things that are covered, quote, the impossibility or imprudence of a trust provision. With our presider's permission, I have one other question. Please. And that is with respect to page 10 of the agreement. She was asked to list the things she was going to use the account for, and she certainly listed there things that she could not have used the trust for. If I did not hear you say anything about this during your oral argument, shouldn't we consider this on the ambiguity question? The most contemporaneous evidence of what was in her head is obviously what was written down in this trust because she signed it apparently that day. In what she could use it for, what she wanted to use it for on page 10, she includes help son with student loans. So clearly she wanted to help her kids, which I think goes to contradict Ms. McGowey's testimony. However, the idea that she didn't want to help her kids is completely contradicted by the trust itself. She made Devon Reese, her other son, her primary point of contact. Also set forth, I believe, on page 4 or 5 of the trust. All right. Thank you. Thank you. Mr. Gray. Thank you. Thank you, Your Honors. Good morning. My name is David Gray. I'm here representing the National Foundation for Special Needs Integrity. May it please the Court. No matter what theory the estate relies upon to challenge the district court's decision, whether it's mistake, reformation, deviation, or seeking rescission, the estate must show by clear and convincing evidence what the intent of Ms. Evans was at the time she executed the joinder agreement. Under Indiana law, this is required under any theory, as well it should be. There is no evidence in the record, let alone of a clear and convincing nature, that Ms. Devon's intention was anything other than that the balance of her account would go to the National Foundation for Special Needs Integrity. That's what the document says. So what do we make of the language that I quoted earlier? Yes. Your Honor, the way I understand that language to be the first part that you can start where it says no part goes to the trust. With an exception that does not apply. With an exception that does not apply. That's to describe, as most people have, most situations are such that they do owe Medicaid substantial amounts of money. And so that deals with that situation because it specifically references the statutory provision that allows for that. If you could please stay close to the mic that's recording is the one in the middle. Gotcha. Sorry, Your Honor. That specifically references the statutory provision that deals with the reimbursement to Medicaid. Then later in the document we discuss what happens if, in fact, there is no Medicaid reimbursement due. In other words, there's money left over. That's creative, but I don't see that in the text. I see flat contradiction there. Well, the only way I can explain that, Your Honor, is the reference in the first part. The other explanation is Mr. Services. He was trying to make this ambiguous and confusing for the Medicaid officials. That was his testimony, right? That is correct. He is a disgruntled former employee, but that was his testimony. He's the fellow who set this up, right? That's correct. He was the founder. This was his program. Ordinarily, there's not a big problem in trying to construe ambiguous documents against the drafter. Correct. Whether you need clear and convincing evidence for that, I don't know. But I'm very troubled. I didn't see the district judge engage with that problem in the document. She just said there's no contradiction. That is correct, Your Honor. I do not recall any reference to the specifics that you've addressed. I've given you my explanation, Your Honor. Okay. We believe that there is any other reason to think, apart from the way you construe those two sentences together, is there any other reason to think that Ms. Givens wanted Mr. Services' foundation to be the residual beneficiary? Your Honor, I think that you mentioned or somebody mentioned the other provision of the trust that discusses what she wants to see done with her money. I think it is important to note that prior to that discussion, the document specifically states, and I quote, Please understand that we ask this question simply to get to know you better. Then it goes on, emphasized in italics, to state, again, before she's asked to describe what it is she wants to do with her money, the laws of your state affecting how you can and cannot use your subaccount will dictate whether or not we ultimately are able to make a disbursement from your subaccount on any particular occasion. I presume that talks about the lifetime, right? I believe, yes, Your Honor. So let me just ask my question again. Okay. Is there any evidence, other than your construction of these two contradictory sentences, that suggests that Ms. Givens intended your client to be the residual beneficiary after her death? Your Honor, the only other evidence that I would point to is the fact that she was represented by counsel at the time. Presumably counsel at the time understood this document and its legal ramifications. Well, but even if it was written to confuse Medicaid officials. Even if it was written to confuse Medicaid officials. Medicaid officials really is a red herring, Your Honor, because we're talking about this positive performance. No, it's not a red herring given the confusing nature of the document that the district judge treated as unambiguous so as to reach this very odd result. I need to ask you about the laches defense, which seems to sweep across all the plaintiff's defenses, or the defendant's claims. First of all, what does the evidence tell us about when the foundation made a final decision to keep the money and not to turn it over to the claimants? Your Honor, I do not know that there is any testimony as to specifically when that decision was made. I do know that the money was gone. It had been spent one year before February of 2014. Yes. All the money at that point had been put into your client's operating account. That's correct. When did the Missouri Medicaid program, in essence, say we don't have a claim here? Very early on, Your Honor. And where does that show in the evidence? I'm not sure that it is in the evidence. I don't know the record exactly. Then how could Mr. Service testify that he did not know, as far as he was concerned, no decision had been made as late as his departure in 2014 to keep the money? That I don't know, Your Honor. And his successors have said they didn't decide to keep it either. That is why I rely upon the fact that there was testimony that I do recall that money was spent one year before. Right. The money is spent. Okay. Let's go from that and then shift gears to what Mr. Reese and his siblings knew. They obviously knew they weren't first in line. Correct. What's the best evidence that they were told Medicaid has no claim, but we're keeping the money? When did that happen? According to the transcript on Pages 42 and 43, Mr. Reese testified at trial, no uncertain terms, that the Gibbons children were fully aware that the Foundation would not be distributing any grant funds to them within three months of the November 2011 funeral. That's half the question. Yes. They're not distributing it that promptly. But it doesn't say we're not giving it to Medicaid either, we're keeping it. He didn't say that. So is there any other evidence? Not that I'm aware of, Your Honor. That's a huge problem for your laches defense, isn't it? I don't believe so, Your Honor. Why not? Where is the communication of a known right? The known right is their right. They were told three and a half years beforehand that they were not going to get the money. The money was gone a year beforehand. They're not told they're not getting the money ever. That's not what he said. And you all don't even have records of a decision. You just have the money shifted from one account to another in 2013 and then again in 2014. Correct. And when I look at the correspondence from 2015, the formal demand letter and your firm's response, I don't see any suggestion, oh, we told, you know, look back at our letter of, you know, from 2012 or 2013 where we told you what we were going to be doing. There's no reference to such prior communication. To my knowledge, there's no reference to them concerning the Medicaid. It's not going to be repaid. Okay. Or it's not owed anything. Right. So as far as, you know, all that the family knows is that they don't have a claim ahead of Medicaid. But they don't know what their rights are vis-à-vis the foundation until much later. I believe that they do know in November of 2011 that they were not going to get any money. They knew that they were behind Medicaid in line, but they did not know what the situation was regarding the foundation's claim over the family's. Your Honor, there was no. And whether that was the fault of their counsel or the fault of the foundation, it's clear that they did not know, the family did not know. There is no reference made to the fact about Medicaid in any of their discussion or in their testimony. I will admit that. But I'm not sure that that concludes that they felt that they were behind Medicaid. I'm not sure that that's the case at all. So your theory is that all these folks who clearly expressed interest in this were lulled by what? I don't know, Your Honor. Did nothing. They did nothing for three and a half years. And you all said nothing. Never said Medicaid has no claim, but we're keeping the money. We did tell them in November of 2011, as Mr. Reese testified, that he was told that he was not going to get any money. He's not testimony was not ever, right? Just not now. There was no reference to a time frame, Your Honor. All right. Okay. If a document, and this is more of a contract between these two parties, really, and there are services to be provided. If a contract is ambiguous, does the clear and convincing evidence standard apply to interpretations of it? I don't think so. I'm not sure, Your Honor. Under Indiana law. But I do think it is significant that there is no evidence in the record as a whole. We had, first of all, this case was first tried on summary judgment, de novo review. I agree with that. Then we did have a trial. And, in fact, throughout the trial, the appellant, in his briefing, relies upon the trial testimony, not the testimony presented at summary judgment stage, to make his points. I'm not sure what the court is going to do next, if there is a remand, if there is a determination that this is ambiguous. We've already had one trial. Why should we not simply decide this is an ambiguous document, it needs to be construed against the drafter and order distribution? Well, again, I believe that the latches argument does prevail. Okay. What if latches doesn't work? If latches doesn't work, then nothing prevents you. Okay. And if some fees were assessed that were clearly legitimate, correct? I'm sorry? Some fees were assessed that were clearly legitimate, correct? Yes, yes, Your Honor. So it would be difficult to simply restore the status quo completely, not back to $254,000 and change that was contributed. Correct. Okay. If there's no further questions from the court, then thank you very much. All right. Thank you. Mr. Beckmeyer, your time had expired, but we kept you at the podium with questions. You may have two minutes in rebuttal. Thank you. I'll go quick. On the legal standard, the clear and convincing would not apply if the trust was construed to be ambiguous. In addition, I believe that Barry v. Ford and other cases we cited creates a presumption in favor of errors when there's an ambiguity, which also should be applied. Any reason that Teresa Givens wanted the money to stay, to answer your question, with NFS&I, there is no evidence in the record she wanted the money to stay with NFS&I. There is ample, ample evidence to the contrary. She wanted it to go to her kids. That's what all the evidence says. The idea that her counsel messed that up and was represented by counsel, the record is clear. Her legal counsel didn't even read this jointer agreement. So there's no way you can blame it on her. Oh, she should have known it by her lawyer. You hit it on the head on latches. Whitney was never notified. None of them were. I asked every single, if you read the transcript from the trial, I asked every single witness from NFS&I, when were they notified that you were keeping the money? They weren't. Every single one of them answered that. A decision was never made. Ask that question. Every single one of them, when was the decision made to keep the money? A decision was never made. Presumably something happened when the money was transferred into the operating account. Right, but they said that was their normal course, that they would move it from one fund to the green fund or whatever all the different funds were. And Shane's service testified specifically when he left in August of 2014. He ran the show. No decision had been made about her money yet. So those transfers out of the trust account occur in the ordinary course, into the operating fund? Yeah. Good question. What's Mr. Service's situation at this point? It's outside the record of appeal. Would you like me to answer? Yes. I believe he's under either at least state indictment, if not federal. Those are matters of public record. Yes, sir. This idea of the trial testimony versus the summary judgment, if you look at Docket 69, which is our memo in support on summary judgment, Shane's service's testimony from his deposition is spelled out within there, where he essentially testifies to the same things on the idea of a mistake, on the idea of, you know, the ambiguities and such. So I believe that if they weren't referenced appropriately in our briefing, I apologize, but they clearly are within the record. The damage amount, Your Honor, was stipulated at $234 and change. I don't have the exact number in front of me. That deducted their fees and the disbursements to Ms. Givens. We do not believe it would be equitable to rescind the trust and give her all her money back. Their fees were incurred in good faith. Therefore, they should be able to keep their fees, but she should get the remainder fund. All right. Thank you. Our thanks to all counsel. The case is taken under advisement.